**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN BRADLEY PETERS, SR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 16-260 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| JASON BROWN, KEVIN BICKLE, | ) | |
| WILLIAM GALLAGHER, | ) | |
| and BROOKVILLE BOROUGH, | ) | ECF No. 78 |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Presently before the Court is the Motion for Summary Judgment filed by Defendants Jason Brown, Kevin Bickle, William Gallagher, and Brookville Borough. (ECF No. 78.) For the reasons discussed below, the Motion will be granted.

RELEVANT FACTS

The following facts are taken from the parties' Concise Statement of Material Facts, Responses thereto, and accompanying appendices (ECF Nos. 80, 79-1, 86, 86-1 through 86-17, & 92) and are undisputed unless otherwise indicated.

On March 5, 2014, Plaintiff John Bradley Peters, Sr. ("Plaintiff") and his wife Stacey Peters ("Stacey") began drinking at about 4:30 p.m. (ECF Nos. 80 & 86 ¶ 2.) They drank four shot and a half glasses of Windsor Canadian, 80-proof whiskey. (ECF Nos. 80 & 86 ¶ 3.) They stopped drinking that evening around 8:00 p.m. when their teenage sons, Tyler and Bradley, returned home. (ECF Nos. 80 & 86 ¶ 4.)

At about 9:00 p.m. Stacey went upstairs to bed. Approximately five (5) minutes later, Plaintiff went upstairs, pulled out a laundry basket from the top of the stairs, stepped backwards, and fell down 13 steps, hitting his head on the bottom of the wooden steps. (ECF Nos. 80 & 86 ¶

5.)  Due to Plaintiff's behavior prior to the police arriving, Plaintiff states that he may have sustained a concussion from falling down the steps.  (ECF No. 86 ¶ 6.)  Plaintiff does not recall anything that subsequently transpired from the time he began to fall backwards down the steps until he woke up at the Jefferson County Jail ("Jail") on March 6, 2014.  (ECF Nos. 80 & 86 ¶ 7.)  Plaintiff admits that none of the events alleged in the Amended Complaint concerning what transpired between the time Plaintiff fell down the steps and the time he arrived at the Jefferson County Jail are based upon first-hand information known by Plaintiff.  (ECF Nos. 80 & 86 ¶ 8.)

Stacey told Plaintiff that if he did not get up, she was going to call an ambulance.  Plaintiff immediately got up, but kept falling.  He fell into the living room, knocked down decorative wall hangings, fell into a table, and would not allow Stacey to help him up.  (ECF Nos. 80 & 86 ¶¶ 9-11.)  Thereafter, Stacey and Plaintiff's sons, Tyler and Bradley, helped Plaintiff up and sat him in a computer chair in the dining room.  After Plaintiff fell over in the chair twice, they convinced him to go into the living room to sit on the couch.  (Tyler Peters Affidavit, ECF No. 84-6 at 2; (ECF Nos. 80 & 86 ¶ 12.)  Plaintiff fell two more times, then crawled to the couch.  (ECF No. 84-6 at 2-3.)  Plaintiff laid down on the couch face down and began thumping his leg on the floor.  He sat up and began talking about little bugs and twinkling lights.  He told Stacey that they were going to get her.  He began pointing at what he thought were little bugs and twinkling lights.  (ECF Nos. 80 & 86 ¶ 13.)

Suddenly, Plaintiff sat up and said, "I may have to go get my .270 and shoot you."  Stacey states in her affidavit that, at that point,  she was terrified.  She further states that she didn't understand what was going on, and when Plaintiff looked at her, he didn't seem to make any connection to her, as if he was looking right through her.  Stacey stated that she was going to call 911.  (Stacey Peters Affidavit, ECF No. 86-2 at 2-3.)

The 911 tape was played at Stacey's deposition and transcribed by the court reporter. Plaintiff and Stacey contend that the tape was altered.[1] (ECF Nos. 80 & 86 ¶ 16.) During her deposition, Stacey testified that she believed the 911 tape was altered because her son's voice is not audible, nor is the sound of her son "beating on the door that [she is] right beside[.]" (Stacey Peters Dep., ECF No. 79-1 at 39.) Stacey admits that to her knowledge, the tape accurately reflects what she said to 911 and what 911 said to her. (ECF No. 79-1 at 40, 41-42.)

The following is the contents of the 911 tape submitted by the moving Defendants from the deposition transcript.[2] Asterisks denote deleted portions of the deposition transcript where defense counsel interrupted the 911 tape to question the deponent regarding the tape.

911 OPERATOR: 911, what is your emergency?
MRS. PETERS: 25 Grant Street, Brookville, PA
911 OPERATOR: 25 Grant Street?
THE WITNESS: Yes.

*******************

911 OPERATOR: Okay. Your name?
MRS. PETERS: Stacey Peters.
911 OPERATOR: And the phone number that you are calling from?
MRS. PETERS: 648-1793. Please hurry up.
911 OPERATOR: What is going on there?
MRS. PETERS: My husband is drunk, and he's smacking everybody around, my kids and me.
                 Please hurry up.

*******************

911 OPERATOR: Does he have any weapons?
MRS. PETERS: No, but he threatened to shoot me.
911 OPERATOR: Okay. Are there any guns in the house?
MRS. PETERS: Yes.

*********************

---

[1] As noted above, Plaintiff does not have an independent recollection of what transpired from the time he began to fall backwards down the steps until he woke up at the Jefferson County Jail on March 6, 2014. (ECF Nos. 80 & 86 ¶ 7.)
[2] Defendants also submitted the 911 recording on CD disc. (ECF No. 79-1 at 66-67.)

911 OPERATOR: Okay.  Does he have access to them?
MRS. PETERS: Yes, he does, but he doesn't have them.
911 OPERATOR: Okay.  And is he –
MRS. PETERS: My oldest son is here now.
911 OPERATOR: Okay.
MRS. PETERS: I can't get the door open.
911 OPERATOR: What's that?
MRS. PETERS: I can't get the door open.
911 OPERATOR: Okay. Where are you in the house?
MRS. PETERS: I'm in the dining room.

*************************

911 OPERATOR: Are you in a safe location?
MRS. PETERS: Yes, my son just broke the door in.
911 OPERATOR: Okay.  Do you need an ambulance?
MRS. PETERS: No.
911 OPERATOR:  Does anybody out there need an ambulance?
MRS. PETERS: No.
911 OPERATOR: Okay.  My partner does have the paramedics—or I'm sorry, the police coming [sic].  Do you want me to stay on the line until they get there?
MRS. PETERS: Yes.
911 OPERATOR: Who else is in the house besides you and your husband?
MRS. PETERS: I have three sons and my husband.
911 OPERATOR: Are all three sons there?
MRS. PETERS: My oldest one just came here.  He's 20.
911 OPERATOR: Okay.
MRS. PETERS: He just broke in the back door.
911 OPERATOR: Only you three in the house or is everybody there?
MRS. PETERS: What?
911 OPERATOR: Is it only you three in the house or is everybody there?
MRS. PETERS: No, there is four of us.
911 OPERATOR: Okay.
MRS. PETERS: I'm sorry.  There is five of us.
911 OPERATOR: Okay.  And you are in a safe location?
MRS. PETERS: Yeah, I'm in the kitchen.
911 OPERATOR: What about your sons?  Are they in a safe location?
MRS. PETERS: No, they're fighting with him.

*****************************

911 OPERATOR: And are you sure you don't need an ambulance?
MRS. PETERS: No.
911 OPERATOR: No.  And you said that your oldest son is 20?
MRS. PETERS: Yes.

911 OPERATOR: Okay. What are the ages of the other two?
MRS. PETERS: 15 and 14.
911 OPERATOR: Okay.

(ECF Nos. 80 & 86 ¶ 16.)

Stacey called her oldest son Brandon, age 20, for help, shortly before she called 911. As described in the 911 tape recording, Brandon arrived and attempted to get in the house through the back door, but Stacey and Brandon were unable to get the door open. (ECF Nos. 80 & 86 ¶ 17.) Brandon had to break down the door. (ECF Nos. 80 & 86 ¶ 18.)

At 10:27 p.m., Sergeant Kevin Bickle and Officer William Gallagher of the Brookville Borough police were dispatched via the 911 unit to what they were told was a domestic dispute at 25 Grant Street in Brookville. (ECF Nos. 80 & 86 ¶ 19.) A document entitled "Detail Call for Service Report" ("Service Report") indicates that the officers arrived on scene at 10:29 p.m. At 10:30 p.m., the Service Report reflects that "CALLER REPORTING THAT HER HUSBAND WAS DRUNK AND HE WAS HITTING HER AND HER 2 SONS. CALLER ADVISED THAT HER OLDEST SON SHOWED UP AND NOW ALL 3 SONS WERE FIGHTING WITH THE HUSBAND." (ECF No. 79-1 at 71) (capitalization in original). The Service Report further reflects at 10:31 p.m. that "CALLER SAID THERE WERE NO WEAPONS INVOLVED HOWEVER THE MALE DID HAVE ACCESS TO THE GUNS BUT DID NOT HAVE THEM OUT." (ECF No. 79-1 at 71) (capitalization in original).

Upon arrival, the officers were met at the door by one of Peters' sons and Stacey. They went to the living room where Plaintiff was located. Plaintiff appeared to the officers to be very intoxicated. He was wearing only a pair of white long johns. (ECF Nos. 80 & 86 ¶ 21.) Sergeant Bickle went into the kitchen with Stacey, while Officer Gallagher remained with Plaintiff. (ECF Nos. 80 & 86 ¶ 22.) Sergeant Bickle asked Stacey what had happened. She

responded that they were drinking "Crown" between the hours of 4:00 p.m. and 8:00 p.m. and had stopped shortly before 8:00 p.m. before their sons Tyler and Bradley returned home. (ECF Nos. 80 & 86 ¶ 23.) Stacey stated that she tried for over an hour to calm Plaintiff but could not. (ECF Nos. 80 & 86 ¶ 24.) According to the Police Criminal Complaint, Plaintiff pushed Stacey in the neck area leaving a red mark. (ECF No. 86-8 at 4.) Bickle observed redness on Stacey's neck and asked if she needed to go to the hospital. She stated that she did not. According to Plaintiff's son Tyler, however, he did not see a red mark on his mother's neck after looking carefully under the ceiling light. (ECF Nos. 80 & 86 ¶ 25.)

Sergeant Bickle advised Stacey that pursuant to the domestic violence laws, the officers had to arrest Plaintiff for assaulting her. Stacey objected, but Sergeant Bickle stated that it was not her call, that the officers had to follow Pennsylvania law, which required the arrest. (ECF Nos. 80 & 86 ¶ 26.) While Sergeant Bickle was speaking with Stacey, Officer Gallagher was speaking with Plaintiff, who was rambling and indicated something about slow dancing with people. (ECF Nos. 80 & 86 ¶ 27.) When Sergeant Bickle walked back into the room where Plaintiff and Officer Gallagher were, Sergeant Bickle stated that Stacey had a red mark on her neck where Plaintiff had pushed Stacey. (ECF Nos. 80 & 86 ¶ 28.) Sergeant Bickle advised Plaintiff that he was being arrested for simple assault under the domestic violence laws and needed to get dressed to go with them. (ECF Nos. 80 & 86 ¶ 29.) Plaintiff attempted to put on his pants but needed assistance from one of his sons. Plaintiff denies that he was intoxicated, but instead, states that he needed assistance because of the injury to his head when he fell down the steps. (ECF Nos. 80 & 86 ¶ 30.) Hospital records, however, indicate that a sample collected on March 6 at 12:10 a.m. reflected that Plaintiff had a blood alcohol level of .2494 g/dL. (ECF No. 79-1 at 107.) Plaintiff began putting on his clothes and became very agitated at Sergeant Bickle

indicating that Bickle was the reason that "[Judge] Bazylak took his grandkids and everyone was fucking lying about it." (ECF No. 86 ¶ 31.) Defendants state that at this time, Plaintiff threatened Bickle that during hunting season he would kill him. Plaintiff neither admits nor denies that he made this threat. (ECF Nos. 80 & 86 ¶ 31.)

At this point, Gallagher, Bickle and Plaintiff's sons escorted Plaintiff to the front door. (ECF Nos. 80 & 86 ¶ 32.) Defendants state that Plaintiff became more verbally combative and threatened Bickle with death and serious bodily injury. Plaintiff denies that he made these threats and responds only that as soon as they got to the door, Plaintiff suddenly turned around and tried to "kind of swim" through the sons and officers back to the living room. (ECF Nos. 80 & 86 ¶ 32.) Defendants state that Plaintiff pushed past his sons and struck Bickle with his fist on the left side of his forehead/skull. Plaintiff denies this; however, he pled guilty to doing so and served two years in prison as a result of striking Sergeant Bickle. (ECF Nos. 80 & 86 ¶ 33; ECF No. 79-1 at 115-126; ECF No. 79-1 at 11-12, 24-25.) (*See also* Brandon Peters Affidavit, ECF No. 86-3 at 3 (Sergeant "Bickle was hit.").) Officer Gallagher then punched Plaintiff in the face. (ECF Nos. 80 & 86 ¶ 34.) Plaintiff denies that he lunged toward Gallagher but admits that Gallagher struck Plaintiff in the back of Plaintiff's head with his forearm to bring Plaintiff to the ground. (ECF Nos. 80 & 86 ¶ 35.) Plaintiff went to the ground and Officer Gallagher got on top of him and held him down while Sergeant Bickle, with the help of one of Peter's sons, were able to get Plaintiff handcuffed behind his back. Even then, Plaintiff continued to resist arrest. (ECF Nos. 80 & 86 ¶¶ 36-37.) Plaintiff admits that after he was cuffed, he kept trying to stand up but denies he attempted to kick the officers by bending his knees and raising his feet. Plaintiff also denies that he attempted to bite Bickle's hands. (ECF Nos. 80 & 86 ¶ 38.)

At this point, Sergeant Bickle and Officer Gallagher called for assistance from the Pennsylvania State Police and Brookville Chief of Police Jason Brown. The Jefferson County EMS was also called and asked to stage near Plaintiff's home. (ECF Nos. 80 & 86 ¶ 39; ECF No. 79-1 at 71.)

At 10:46 p.m., Chief Brown was dispatched and was en route from his home to Plaintiff's home in response to the call for assistance from Sergeant Bickle and Officer Gallagher. (ECF Nos. 80 & 86 ¶ 42.) The parties dispute precisely when Chief Brown arrived at Plaintiff's residence. Plaintiff submits that because Chief Brown's house is 4.7 miles from Plaintiff's house, driving at the legal speed limit, Chief Brown would have arrived 8 minutes after dispatch. If driving faster than the legal limit in response to an emergency call, Brown would have arrived in less than 8 minutes. Chief Brown indicates that he arrived at Plaintiff's home at 11:00 p.m. (ECF Nos. 80 & 86 ¶ 43.)

The parties agree that after Chief Brown arrived, he placed his right knee on Plaintiff's back at the base of his neck, although Plaintiff denies that it was done for the purpose of controlling Plaintiff so the paramedics, staged outside, could enter and attend to Plaintiff. (ECF Nos. 80 & 86 ¶ 44.) Record evidence reflects, however, that the medics found Plaintiff to be "conscious, agitated and combative." (Jefferson County EMS Incident Report, ECF No. 79-1 at 80.)

Plaintiff further submits that at the time Chief Brown arrived, Plaintiff was on the floor face down, handcuffed and zip-tied, and the only thing he could move was his head, and could do nothing but complain about flashbacks and rub his face on the carpet. (ECF No. 86 ¶ 44.) In addition, Plaintiff submits the portion of his son Tyler's Affidavit which states that he could see

his Dad being smashed under the Chief's weight and could see that his Dad was struggling to breathe. (Id.)

At 11:01 p.m., the medics arrived at Plaintiff's home after being staged since 10:56 p.m. near the home. (ECF Nos. 80 & 86 ¶¶ 47-48.) The medics entered the home, went directly to Plaintiff, and were by Plaintiff's side at 11:03 p.m. (ECF Nos. 80 & 86 ¶ 49.)

The parties dispute how long Chief Brown remained with his right knee on Plaintiff's back at the base of his neck. Plaintiff directs the Court to the Affidavit of his son Tyler who states that Brown's knee remained for at least 15 minutes while the paramedics went out to their truck to retrieve a stretcher. Upon their return, Chief Brown got off of Plaintiff and helped to roll him onto the stretcher face down. (Tyler Peters Affidavit, ECF No. 86-4 at 6.) Defendants point to the paramedics' EMS Report that reflects that the paramedics were by Plaintiff at 11:03 p.m., and left the scene for the hospital at 11:19 p.m., for a total of 16 minutes. The Defendants contend that if Tyler Peters' account is correct and the paramedics were away at their truck for 15 minutes, that would leave the paramedics only one minute for them to feel Plaintiff's hands and ankles, talk to him, place him on a stretcher, carry him to the ambulance, place him inside the ambulance, and then get inside the ambulance and drive off to the hospital. In addition, Defendants look to Stacey Peters deposition where she testified that when paramedics arrived they attended to Plaintiff immediately, and Chief Brown would have necessarily removed his knee at that time. (ECF Nos. 80, 86 & 92 ¶ 51.)

Defendants also respond that Tyler's statement that his Dad was struggling to breathe under the weight of Chief Brown is irreconcilable with medical records and Plaintiff's admission that he has no medical evidence of injury from the actions of the officers. They direct the Court to the Affidavit of Chief Brown who denies that he put his full weight on Plaintiff, stating that he

weighed over 300 lbs. at that time, and that he would have severely injured Plaintiff if he had put his full weight on the base of his neck. (Brown Affidavit, ECF No. 79-1 at 53, ¶ 5.)

Plaintiff was then transported to Brookville Hospital. Officer Gallagher accompanied the medics to the hospital along with one of Peters' sons. Prior to the ambulance leaving for the hospital, Sergeant Bickle told Stacey that her son Brandon was in the ambulance and was going with Peters to the hospital. Sergeant Bickle told Stacey that she could come to the hospital to be with Peters while he was being examined. The medics arrived at the hospital at 11:27 p.m. and Peters was taken to a bed where care was transferred to the nursing staff and R.N. Adams. (ECF Nos. 80 & 86 ¶¶ 52-56.) Emergency Transfer Documentation reflects that on triage, Plaintiff was agitated and combative, and due to aggressive behavior and combativeness, it was very difficult to obtain patient history. (ECF No. 79-1 at 101-02.) It is also noted at 11:45 p.m. that Plaintiff was "REPEATEDLY YELLING OUT FOR THE BROOKVILLE BORO POLICE OFFICERS. USING PROFANITY AND THREATENING TO MAKE THEM PAY FOR 'DOING THIS TO ME WHEN I WASN'T DOING ANYTHING WRONG. ALL I DID WAS MIND MY OWN BUSINESS IN MY OWN HOUSE. I'M COMING AFTER YOU ***HOLES.'" (ECF No. 79-1 at 103) (capitalization in original).

On March 6 at 12:46 a.m., Brandon and Stacey Peters visited Plaintiff. Stacey reported to hospital medical personnel that Plaintiff had fallen down 13 wooden steps and struck his head. She reported that she had never seen him acting as he did that night and that he was looking "right through her." She also told them that he had been punched by the police. Stacey also told R.N. Adams that Plaintiff's face and nails were blue and his face was drooping. (ECF Nos. 80 & 86 ¶ 57.) At 12:55 a.m., Chief Brown and Sergeant Bickle took Plaintiff for a CT scan of his head. (ECF Nos. 80 & 86 ¶ 58.) The results of the CT scan indicated no acute intracranial

pathology.  (ECF No. 79-1 at 106-07.)[3]  Plaintiff returned to the emergency room at 1:23 a.m.  (ECF Nos. 80 & 86 ¶ 59.)  At 1:35 a.m., he was released to the police after the Brookville Hospital examining doctor discharged him, stating "MEDICALLY CLEARED TO GO TO JAIL."  (ECF No. 79-1 at 104) (capitalization in original).  At 1:37 a.m., Plaintiff left the Emergency Department.  (ECF No. 79-1 at 104.)  Bickle and Gallagher then transferred Plaintiff to the Jefferson County Police Station where he was incarcerated pending court action.  (ECF Nos. 80 & 86 ¶ 61.)

On March 6, 2014, Plaintiff was charged with Aggravated Assault of a Police Officer (Sergeant Bickle) pursuant to § 2702(a)(6) of the Crimes Code.  (ECF Nos. 80 & 86 ¶ 62.)  On September 3, 2014, Plaintiff pleaded guilty to the offense and was sentenced to a minimum of six (6) months and a maximum of 24 months in prison.  The Court ordered Plaintiff to pay Sergeant Bickle approximately $100 for the handcuffs he broke while Bickle was trying to restrain Plaintiff.  As a result, Plaintiff served close to two (2) years in prison.  (ECF Nos. 80 & 86 ¶¶ 63-65.)

Plaintiff has presented no medical evidence, nor medical expert report, indicating that Plaintiff suffered from any physical condition as a result of the conduct of the police on the evening of March 5, 2014.  (ECF Nos. 80, 86 & 92 ¶¶ 66-69.)


LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that

---

[3] Specifically, there was no intracranial hemorrhage nor intra-axial or extra-axial fluid collections.  (ECF No. 79-1 at 106-07.)

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id*. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

ANALYSIS

Section 1983

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, the Plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law, and that such conduct deprived the Plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

1. <u>Fourteenth Amendment deliberate indifference to medical needs during an arrest</u>

Defendants argue that their Motion for Summary Judgment on this claim must be granted because record evidence demonstrates that medical personnel were given complete information regarding Plaintiff's injuries; Defendants called paramedics and assisted them in transporting Plaintiff to the hospital; Plaintiff was given a CT scan; and he was medically cleared to be released to Jail. In addition, Plaintiff presents no medical expert testimony or report that shows he suffered any harm as a result of the Defendants' alleged deliberate indifference to Plaintiff's medical needs. Plaintiff argues that Defendants failed to provide complete information regarding his injuries to medical personnel.

In order to make out a claim for Fourteenth Amendment deliberate indifference to medical needs during the course of an arrest, Plaintiff must show the following: 1) a serious medical need; 2) acts or omissions by the arresting officers that indicate deliberate indifference

to that need; and 3) a causal connection between that indifference and Plaintiff's injury. *See Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014); *see also Suarez v. City of Bayonne*, 566 F. App'x 181, 187 (3d Cir. 2014).

The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). The parties do not dispute that Plaintiff's medical needs were serious.

The second prong is a subjective standard which requires a court to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). Here, the record is clear that Plaintiff received prompt medical treatment from paramedics that were called to the scene, and from emergency room medical personnel once he arrived at Brookville Hospital. This treatment included a CT scan. In addition, Defendants did not transport Plaintiff to Jail until he was medically cleared by a physician.

Plaintiff suggests that the Defendants were deliberately indifferent to his medical needs because the hospital records do not reflect that they told hospital personnel about his injuries sustained during the arrest, his fall down the stairs before they arrived, and that he had a heart

condition.[4]  Plaintiff has come forward with no evidence as to what the police did or did not say to medical personnel.  Relatedly, Plaintiff has come forward with no evidence that the hospital notes reflected everything that was communicated by Defendants to the medical personnel.

Instead, record evidence reflects that Plaintiff's wife informed hospital personnel that Plaintiff had fallen down 13 wooden steps, striking his head.  She further informed them that she had never seen him behave like this before, and that he had been punched by police.  Thereafter, Defendants transported Plaintiff for a CT scan at the hospital.  Consequently, medical personnel received all relevant information and record evidence does not reflect that Plaintiff was harmed by Defendants' alleged omissions.  Importantly, Plaintiff comes forward with no medical evidence connecting the Defendants' alleged deliberate indifference to his alleged injuries.

Therefore, because no reasonable jury could return a verdict in favor of Plaintiff on this record relating to his claim for deliberate indifference to medical needs during an arrest, Defendants are entitled to judgment as a matter of law.  In addition, because the individual Defendants are entitled to judgment as a matter of law on this claim, Brookville Borough is also entitled to judgment as a matter of law on the theory of municipal liability.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

2.  <u>Fourth Amendment Excessive Force Claim against Defendants Brown and Brookville Borough</u>

Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claim because Plaintiff has failed to come forward with evidence from which a reasonable jury could conclude that Chief Brown used excessive force in restraining Plaintiff.  Defendant

---

[4] Plaintiff contends that Defendants would have learned of his heart condition when his son asked them not to taze his father because he had a heart condition.

Brown further argues that he is protected by qualified immunity. Plaintiff argues that Chief

Brown's restraint was unnecessary and unreasonable under the circumstances.

<u>Qualified Immunity</u>

State officials performing discretionary acts enjoy "qualified immunity" from money

damages in § 1983 causes of action when their conduct does not violate "clearly established"

statutory or constitutional rights of which a "reasonable person" would have known at the time

the incident occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533

U.S. 194 (2001), the United States Supreme Court discussed the two-step qualified immunity

inquiry. The Court directed that, in deciding whether a defendant is protected by qualified

immunity, a court first must determine whether, "[t]aken in the light most favorable to the party

asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional

right." *Id*. at 201. If the facts do not establish the violation of a constitutional right, no further

inquiry concerning qualified immunity is necessary. *Id*. If the plaintiff's factual allegations do

show a violation of his rights, then the court must proceed to determine whether the right was

"clearly established," that is, whether the contours of the right were already delineated with

sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what

he was doing violated the right. *Id*. at 201-02. Subsequently, in *Pearson v. Callahan*, 555 U.S.

223 (2009), the United States Supreme Court concluded that while the two-step sequence

identified in *Saucier* "is often appropriate, it should no longer be regarded as mandatory." *Id*. at

236.

In determining whether an officer's conduct violated a constitutional right for purposes of

qualified immunity at the summary judgment stage, the United States Supreme Court has

instructed that although a court should view the facts and draw reasonable inferences in the light

most favorable to the party opposing the motion, a court should not rely on these facts where they are "so utterly discredited by the record that no reasonable jury could [believe them]." *Scott v. Harris*, 550 U.S. 372, 381 (2007). That is, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

<u>Fourth Amendment Claim</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. This provision has been made applicable to the states through the Fourteenth Amendment. *Ker v. California*, 374 U.S. 23, 30 (1963).

The Plaintiff contends that Defendant Chief Brown violated his Fourth Amendment rights when he allegedly used excessive force in restraining him so that the paramedics could enter the home from their staging area.

In order to make out a claim for excessive force as an unreasonable seizure under the Fourth Amendment, Plaintiff must show that a seizure occurred and that it was unreasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (alleged excessive force in course of arrest is analyzed under Fourth Amendment). Here, the parties do not dispute that there was a seizure of Plaintiff. Consequently, the only issue before the Court is whether the force used to effect the seizure was objectively reasonable. Whether the use of force is objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, and whether [the complainant] is actively resisting arrest or attempting to

evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In *Graham*, the United

States Supreme Court cautioned that in applying the objective reasonableness test, "[n]ot every

push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," will be

deemed unreasonable. Instead, "[t]he calculus of reasonableness must embody allowance for the

fact that 'police officers are often forced to make split-second judgments – in circumstances that

are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

particular situation.'" *Id.* at 396-97 (internal quotations omitted). In addition, the United States

Supreme Court has emphasized that each case alleging excessive force must be evaluated under

the totality of circumstances. *Id.* at 397.

Here, Plaintiff complains that Chief Brown used excessive force when he placed his right

knee on Plaintiff's back near his neck for what he contends was 23 minutes. Because he has no

recollection of events from the time he fell down the stairs until he woke up in Jail, Plaintiff

relies on the affidavits of his wife and two of his sons to raise issues of material fact as to

whether he was resisting the officers' efforts to arrest him and in doing so, posed a serious threat

of physical harm to the officers and paramedics. The Court considers these affidavits in

conjunction with deposition testimony, a witness statement dated the day after the 911 call,

paramedic and hospital records, and the entire summary judgment record.

Plaintiff's version of the facts concerning Defendants' alleged use of excessive force is

"so utterly discredited by the record that no reasonable jury could [believe Plaintiff's version]."

*Scott,* 550 U.S. at 381.

First, the County EMS Records and 911 Detail Report reflect the facts that were known

to the officers when they arrived at Plaintiff's home. The 911 Detail Report reflects that at 2

seconds before 10:30 p.m., police arrived at the scene and that at 10:30 p.m., the "caller

report[ed] that her husband was drunk and he was hitting her and her 2 sons." At about this same time (18 seconds later), "caller advised that her older son showed up and now all 3 sons were fighting with the husband." About 13 seconds later, the Report indicates that "caller advised the husband was drunk and he started throwing things." (ECF No. 79-1 at 69.) Although Stacey attempts to temper these facts in her deposition testimony when she testified that Plaintiff was merely pushing her and her sons, and that her sons were merely arguing with Plaintiff rather than fighting, it is undisputed that these were the facts in the possession of the officers when they arrived on the scene, and in the possession of Chief Brown when he was called in as back up at 10:46 p.m.

As to the actions of Chief Brown, Stacey states that "Chief Brown went over to [Plaintiff] and for no reason dropped his right knee on his neck. [Plaintiff] was not doing anything at that time. Brandon already had him calm." (ECF No. 86-2 ¶ 4.) She testified in her deposition, however, that during this time, Plaintiff "definitely needed to be subdued." (ECF No. 79-1 at 45.) In their reply brief, Defendants argue that Stacey's Affidavit should be disregarded because it violates the Sham Affidavit Doctrine. As Defendants correctly observe, the Third Circuit recognizes the Sham Affidavit Doctrine, pursuant to which a district court may disregard an offsetting affidavit submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony without explaining the contradiction. *In re Citx Corp., Inc.,* 448 F.3d 672, 679 (3d Cir. 2006) (citing *Baer v. Chase,* 392 F.3d 609, 623-24 (3d Cir. 2004)). Because her deposition testimony conflicts with her statements in her Affidavit, and no explanation is offered regarding the conflict, Stacey Peters' Affidavit will be disregarded pursuant to the Sham Affidavit Doctrine.

Similarly, on March 6, 2014, Brandon Peters wrote out an account of the events that

occurred on March 5, 2014 at his mother's request.  (ECF No. 93-1 at 4.)  In his second

Affidavit, dated April 16, 2018, Brandon repeats the substance of the March 6, 2014 statement.

(ECF No. 86-3.)  However, words are changed in the second Affidavit in an effort to temper

Plaintiff's interactions with the police officers.  For example, in his March 6, 2014 statement,

Brandon states the following with regard to Plaintiff's interactions with the police officers:

> They asked me to help hold his legs and keep him calm as Officer Gallagher went to the car and got the leg ties.  When he came back I held his legs as they put the zip ties on them.  My dad seemed calm so they rolled him over and sat him up.  *My dad started yelling again.*  They said, to roll him back over to his stomach and that they were going to wait for back up to get there and, the ambulance.  We waited a long while, waiting for anyone to show up and help get him out of there.  When my dad was on the floor I was trying to talk to him and was acting like he did not know who I was *and he kept yelling,* "the flashbacks, I'm having flashbacks again!"  and was rubbing his face on the floor.  I tried to hold his head still and talk to him *and he wouldn't calm down and just kept yelling* about "the flashbacks."

(March 6, 2014 Statement of Brandon Peters, ECF No. 93-1 at 2-3) (emphasis added).  In

Brandon's April 16, 2018 Affidavit, the above italicized language is tempered as follows:

> They asked me to help hold his legs and keep him calm as Officer Gallagher went to the car and got the leg ties.  When he came back I held his legs as they put the zip ties on them.  My dad seemed calm so they rolled him over and sat him up.  *My dad started calling Bickle a crooked cop.*  They said, to roll him back over to his stomach and that they were going to wait for back up to get there and, the ambulance.  We waited a long while, waiting for anyone to show up and help get him out of there.  When my dad was on the floor I was trying to talk to him and he was acting like he did not know who I was and, *he kept saying about,* "the flashbacks, I'm having flashbacks again!" and was rubbing his face on the floor.  I tried to hold his head still and talk to him to calm down and, *he just kept saying* "the flashbacks."

(April 16, 2018 Affidavit of Brandon Peters, ECF No. 86-3 at 4) (emphasis added).

Brandon's original statement makes clear that Plaintiff could not be calmed down. The alterations to Brandon's subsequent Affidavit smack of fabrication to bolster his father's excessive force claim.

Plaintiff also attempts to raise a disputed issue of material fact that he did not actually assault Sergeant Bickle, directing the Court to the Affidavit of Tyler Peters. Tyler Peters explains as follows:

> As soon as we got to the door I reached to open it when my dad suddenly turned around pulling his arm away from me. I stood there and watched as he tried to kind of swim through my brothers and the cops back towards the livingroom [sic]. My dad is taller than the rest of us and had his hands above his head trying to squeeze through the people and the doorway. *I saw Officer Bickle fall back into the little corner by the doorway* and the other officer punch my dad in the face, as my dad got past him the officer hit my dad in the back of the head sending him to the floor.

(Affidavit of Tyler Peters, ECF No. 86-4 at 4-5) (emphasis added).

On September 3, 2014, however, Plaintiff pled guilty to the charge of Aggravated Assault as it related to Sergeant Bickle. (ECF No. 79-1 at 115-126.) Plaintiff's guilty plea to the charge of Aggravated Assault of Sergeant Bickle renders Plaintiff's assertion that he did not strike Sergeant Bickle incredible. That is, "under Pennsylvania law, a guilty plea constitutes an admission to all of the facts alleged in the indictment." *M.B. v. City of Philadelphia*, 128 F. App'x 217, 227 (3d Cir. 2005) (citing *Commonwealth Dep't of Transp. v. Mitchell,* 535 A.2d 581, 585 (Pa. 1987)). According to the Police Criminal Complaint, Plaintiff "did strike Sergeant Kevin Bickle who was in full duty uniform displaying a badge of authority, in the head while we were trying to get him out of the residence." (ECF No. 86-8 at 4.) Consequently, Plaintiff's own guilty plea establishes that he did strike Sergeant Bickle while the officers were attempting to remove him from the residence. (ECF Nos. 80 & 86 ¶ 34.)

Relatedly, the Jefferson County EMS Report of the incident reflects that paramedics responded to assist police with a male patent, "possible psychiatric emergency." The Report continues as follows:

> It was reported to crew that while on scene of a domestic this patient had assaulted a police officer and was being restrained by them at this time. After being advised scene was secured arrived and found patient face down on the floor with handcuffs in place, zip ties to his feet, and being physically restrained by at least 3 police officers and his son. Attempted assessment found patient conscious, agitated and combative. He is not reporting any other complaints at this time.

(ECF No. 79-1 at 80.) One of the two attending paramedics, Benjamin Cramer, confirms the details of the EMS Report, indicating that they were dispatched in response to the 911 call at 10:45 p.m., that they were en route to the home at 10:50 p.m., waited briefly near the home "for assurances by the police that the scene was secure," arrived at the house at 11:01, and were actually with the Plaintiff by 11:03 p.m. (Affidavit of Benjamin Cramer, ECF No. 79-1 at 128.) *See also* Jefferson County EMS Report, ECF No. 79-1 at 77. Cramer further states that Plaintiff was being restrained by at least 3 officers and his son, and that he was agitated, combative, and in his estimation, needed to be restrained. (ECF No. 79-1 at 128.)

Plaintiff also attempts to raise a disputed issue of material fact as to how long Chief Brown remained with his knee on Plaintiff's upper back near his neck. Again, Plaintiff admits he has no recollection of these events, and further admits that he has no medical evidence indicating that Chief Brown caused physical injury. Instead, Plaintiff alleges in the Amended Complaint that Chief Brown's knee remained for 23 minutes (ECF No. 55 ¶ 48) although he comes forward with no evidence as to how he knows this. *See e.g.,* Stacey Peters Dep., ECF No. 79-1 at 45 ("I don't know who came up with 23 minutes. I know that it was quite a while, but I don't know that it was 23 minutes. *I don't have any way of knowing.*") (emphasis added).

Plaintiff comes forward with the Affidavit of his son Tyler who states the following:

> I started to record video[5] shortly after the Chief knelt on my dad. After a few minutes the ambulance people came in. One of them saw me recording with my phone and told me to stop. I said, "no". They felt my dads [sic] hands and ankles and tried to talk to him but I didnt [sic] hear him say anything then, they left and went outside to their truck. 15 minutes later they came back in with a stretcher and some straps that looked like seat belts. The Chief got up off my dad and then helped to roll him onto the stretcher facedown. They put the straps over him and cranked them down, covered him with a foil blanket then carried him outside.

(Affidavit of Tyler Peters, ECF No. 86-4 at 6.)

Irrefutable record evidence, however, does not reconcile with Tyler's account. Jefferson County EMS records reflect that the paramedics were "At Patient" at 11:03, and that they "Left Scene" at 11:19, for a total of time at the scene of 16 minutes. If the paramedics left the Plaintiff for 15 minutes to retrieve the stretcher, that would leave them a total of one minute to feel Plaintiff's hands and feet and try to talk to him; roll Plaintiff onto the stretcher; place the straps over him and crank them down; cover Plaintiff with a foil blanket; carry him outside to the ambulance; place him in the ambulance; load his son Brandon into the ambulance with his father; board the ambulance themselves; and start the engine and drive away. Clearly, no reasonable jury could believe Tyler's version of events.[6]

Brookville Hospital Records

Hospital records indicate that Plaintiff arrived at 11:32 p.m. Diagnosis indicates alcohol intoxication. Triage assessment at 11:36 p.m. reflects that Plaintiff's behavior was agitated and combative. (ECF No. 79-1 at 101.) Historical section notes that "patient is being

---

[5] Tyler further states in his Affidavit that he erased the video. (ECF No. 86-4 at 6.)
[6] Similarly, the absence of medical evidence reflecting injury to Plaintiff as a result of the actions of the officers is irreconcilable with Tyler's assertion that the 300-pound Chief placed his full weight on Plaintiff's neck.

uncooperative."  In addition, Keven Paisley, M.D. dictated that "DUE TO AGGRESSIVE

BEHAVIOR AND COMBATIVENESS, PATIENT VERY DIFFICULT TO GET HISTORY

FROM BY ME OR THE NURSING [staff], and I agree with what is documented."  (ECF No.

79-1 at 102) (capitalization in original).  At 11:45 p.m. notes include the following:

> "Appears agitated.  Appears angry.  Appears combative.
> Appears upset.  . . . REPEATEDLY YELLING OUT FOR THE
> BROOKVILLE BORO POLICE OFFICERS.  USING
> PROFANITY AND THREATENING TO MAKE THEM PAY
> FOR 'DOING THIS TO ME WHEN I WASN'T DOING
> ANYTHING WRONG.  ALL I DID WAS MIND MY OWN
> BUSINESS IN MY OWN HOUSE.  I'M COMING AFTER YOU
> ***HOLES.'"

(ECF No. 79-1 at 103) (capitalization in original).

In light of all of the above, Plaintiff's version of the facts that he was calm, not

intoxicated, and there was no need to restrain him, is "so utterly discredited by the record that no

reasonable jury could [believe Plaintiff's version]."  *See Scott,* 550 U.S. at 381.  Consequently,

Defendants' Motion for Summary Judgment on Plaintiff's Fourth Amendment excessive force

claim will be granted.

Finally, Plaintiff has come forward with absolutely no evidence to raise an issue of

material fact relating to Count II of the Amended Complaint against Brookville Borough for

municipal liability.  Therefore, Brookville Borough is entitled to judgment as a matter of law on

Count II of the Amended Complaint.


CONCLUSION

For the above reasons, the Court will grant Defendants' Motion for Summary Judgment

in its entirety.  An appropriate Order will follow.

**BY THE COURT**

24

Dated:  June 12, 2018

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc:     John Bradley Peters, Sr.
        25 Grant Street
        Brookville, PA  15825

        All Counsel of Record
        Via Electronic Filing